No. 25.—Amos Scudder, plaintiff in error, *vs.* Wylly Wood-
bridge, defendant in error.

The doctrine that the principal is not liable to one agent or employee for damages oc-
casioned by the negligence or misconduct of another agent or employee, is not ap-
plicable to slaves.

This was an action on the case, brought by the defendant in error against
the plaintiff in error, in the Superior Court of Chatham county, and was
tried in said Superior Court before Judge Fleming, at May Term, 1846.
For the facts of the case, and the error assigned, see the opinion of the
court. (*supra.*)

Mulford Marsh, for the plaintiff in error.

The action in the court below (Chatham Superior Court) was brought by de-
fendant in error, to recover the value of a negro boy, a carpenter, who was acci-
dentally killed on board the steamer Ivanhoe, owned by the plaintiff in error.
The boy was at work on board, and the action is sought to be sustained on the
ground of carelessness on the part of the captain of the Ivanhoe, who was in the
employ of the plaintiff in error, and that the plaintiff is responsible to every one, as
well those in his employ as to third persons, for the carelessness of his agents.
The Superior Court so instructed the jury, and upon that point the case is
brought before the court.
The error assigned is that the instruction of the court was wrong, and that the
plaintiff in error is not liable for any carelessness of his agents to those in his em-
ploy.
Counsel for plaintiff in error makes the following point: That a master is lia-
ble for the carelessness of his agent only to third persons, and not to those in his
employ.—1 *Blk. Com.* 429,
Blackstone lays down the rule how *strangers* may be affected by the relation of
master and servant.    *Strangers* to the master, not *those in his employ—they are
not strangers.*    And on page 431, he says: "If a servant by his negligence does
damage to a *stranger*, the *master shall answer for his neglect.*"  This rule is found-
ed upon an implied contract, that extends to strangers only—not those in the
master's employ—as fully laid down by Justice Story.—*Story on Agency, sec.* 452,
453, 4 *and* 5.
This rule is clearly recognized in the case of *Murray* vs. *So. Car. Railroad,* by
the Supreme Court of South Carolina —1 *McMullan's Rep.* 385.
The plaintiff was in the employ of the defendant, and sued for damages occa-
sioned by the negligence of another servant of the defendant.  The court held
that the rule of liability extended only to strangers, and that plaintiff could not
recover—he not standing in the situation of a stranger to defendant, being in his
employ.
In the Supreme Court of Massachusetts, in the case of *Farwell* vs. *Boston and
Worcester Railroad Companies,* (4 *Met.* 49,) the court held the same doctrine.
That was an action brought by one in defendant's employ, to recover damages
for injuries occasioned by the negligence of another servant of the defendant, and
the court held the defendant not liable, and recognized the case in South Carolina
as sound law.    This last case was in 1842.
And the Supreme Court of New York, in 1844, confirm the same doctrine in the
case of *Brown* vs. *Maxwell.*—6 *Hill Rep.* 592.
These are all the American cases we find upon the point.    In England, the

same doctrine was held in the case of *Priestly* vs. *Fowler.*—3 *Mees. & Welsb.*— Note in *Story on Agency*, 565.

Not one case do we find like the present, where the master has been held liable for the negligence of his agent. And in this case no negligence has been proven on the part of the plaintiff's agent, save that of the defendant's own boy, who was killed. He was told not to go into the wheel-house; and again, to come out of it. He did wrong in going into a place of danger, and then not coming out when ordered.

If the doctrine contended for by the defendant's counsel be the law, it would, in the language of some of the judges, lead to alarming consequences, and put an end to the existence of masters and servants.

But make him liable to each for the negligence of each, and you will put an end to their employment. No reasonable and responsible man would take the risk.

Suppose a master carpenter, with one hundred men in his employ, responsible for their negligence to all the world, other than those in his employ, is a heavy liability. He could not trust one or more of them to build a scaffold, or do any work, lest by their neglect some of his other workmen should get injured. Nor could he trust a portion on the scaffold, lest they, by negligence, drop a piece of timber or some article, whereby another of his workmen should be injured. It may be justly asked, what rule of law makes him thus liable? It is not in their contract of hiring, nor is it implied from their contract.

And so of every other employment. A stage owner, for instance, is liable to passengers for the gentleness of his horses, the strength of his carriage, &c. But apply the rule contended for by defendant's counsel, and where will it end? Suppose the driver is injured by the breaking down of the stage, the inquiry would lead to the workmanship of the carriage-maker and the blacksmith, and all concerned in making the carriage. The inquiry would be almost endless, and quite absurd.

It is therefore very clear, that the court erred in instructing the jury, and that the plaintiff in error is not liable, and the judgment of the court below should be set aside.

Robert M. Charlton, for defendant in error.

It is said that the usual rule, that a man shall be liable for the acts of his agents, does not apply to this case, because a master is not liable to his servant for the negligent act of another servant in his employ, when they are both engaged in one common undertaking. And three cases are cited to support this position: *Murray* vs. *R. R. Company*, 1 *McMullan*, 385; *Farwell* vs. *Boston & Worcester Railroad Co.* 4 *Metcalf*, 49; *Brown* vs. *Maxwell*, 6 *Hill*, 594.

I propose to show that these cases do not apply to the present case.

And 1st. They do not apply, because it is not denied in these cases (at least in the first two) that a case may not occur where the owner *will* be liable for the acts of one agent to another; as in such cases as where the owner employs unfit and improper persons as agents, by whose ignorance or folly another is injured — 1 *McMullan*, 401; 4 *Metcalf*, 61–62.

Now, this is exactly the view we took of this case to the jury: that the defendant had employed a mason for his captain; a black man for his engineer, and that he had not other hands on board sufficient and skillful for such a purpose; and that the injury was occasioned by the want of competent and skillful persons. The charge of the court was, that if a person did not employ proper persons to control or navigate his boat, he would be reponsible for injuries accruing thereupon; and the jury—the question of fact being left to them—found the negligence in appointing to exist. We are therefore not in conflict with the decision in 1 *McMullan*, and 4 *Metcalf*, because of this distinction.

The case in 6 *Hill* does not apply at all, because the point in that case was, that the plaintiff was equally to blame with the other agent, and therefore he could not

recover. No such point was made in this case; no exception was taken to this point. Beardsley, J., expressly says, in reference to the main principle, "It is not necessary to place the present decision on that principle;" therefore, what he said was mere *obiter dictum*, and not the decision of the court, nor involved in the case.

But, secondly, the cases in *McMullan* and *Metcalf* are not applicable, because they proceed upon the idea, that in cases of this kind, each agent is an observer of the conduct of the others, can give notice of the misconduct, incapacity or neglect of duty, and leave the service if the common employer will not take the necessary precautions, and employ proper agents. And that public policy will be best promoted by taking away the remedy against the employer, and making each agent act as the spy upon the others.—1 *Metcalf*, 59 ; *see Blanding's argument*, 1 *McMullan*, 395.

But we must see that these cases apply to free agents and white men, and not to slaves ; their position in our section of the country would not allow them to direct or interfere ; complain they dare not, and leave they cannot.

The general rule stated in *McMullan* and *Metcalf* may be correct, and yet we must see that the exceptions, in justice and reason, must be numerous.

Even the court in *Metcalf* admits, that there may be implied warranties arising out of the operation of master and servant.—*See* p. 62.

Surely justice requires that every man who employs another in an inferior capacity, does impliedly covenant and contract that the superior agents employed to superintend him, shall be skillful and prudent persons. Every man who holds himself out in a public or any other capacity, thereby impliedly asserts, that he is capable, and will manage properly such business. Such a warranty is implied from the mere fact of holding himself out in such capacity.

The inferior agent cannot control him in the choice of his agents; the inferior not being employed as a skillful person may not be enabled or expected to know whether the superior agent is conducting himself with skill and care, for relying on the implied warranty of the common employer ; and without skill or knowledge to detect the coming evil, his first admonition may be a broken leg : shall he not recover?

3d. But the main objection to the application of these cases to the present is, that these were cases of injury to the *person*; this is a case of injury to the *property*.

No one can doubt, if I hire my servant to another, he is bound to take ordinary care of him, and he is responsible if he does not take such care, by employing incompetent agents to superintend the common employment. It is a case of bailment.

A slave, it is very properly said, is not a bale of goods : but still he is property ; and so far from the fact that he is a human being, as well as property, diminishing the amount of care which the bailee is bound to use towards him, that circumstance increases it, for the sake of policy and humanity.

Evans, J., impliedly admits this distinction when he says : (1 *McMullan*, 399,) No man would have any guaranty for the security of his *property*, if his only remedy for negligence was the irresponsible or insolvent agents which another *might* employ. This shows that the decision he was making, would have varied, if property or bailment had been the question before him.

And O'Neal, J., in dissenting from the majority says : " If the plaintiff, instead of himself, had hired his negro man to the defendants, as second fireman, and he had lost his leg by the carelessness of the engineer, would not the defendants have been liable? It seems to me that they would, or one section of the law of bailments would be repealed by the court of errors.—1 *McMullan*, 404.

Chancellor J. Johnson also speaks in the same manner, exemplifying by the case of an overseer.—*See ib.* p. 407–8. He also asks if we are to look to the irresponsible persons, *perhaps slaves*, hired by the company thus, when the injury occurred?

Now, apply these questions to the case before us.- The jury have found the fact submitted to them, that the death of this slave was occasioned by the acts of defendant's servants; one of them an irresponsible person—a slave. Are we to be insulted by being told to resort to a remedy against the black fireman ! who is not responsible, *civiliter*, and ought not to be responsible, when placed, perhaps against his will, in a position which he has no science to fill ?

Even if the cases in *McMullan* and *Metcalf* are sound law, will this court apply them to a case expressly excepted by the very decisions, and in a case, too, involving property, and the question of bailment ?

The plaintiffs in error may say,·that we did not hire this slave to him; that it is not a case of bailment. We say so also. We did not hire this slave to him ; he was acting without our consent, and taking our property out of the county without our consent; and being thus a wrong-doer, he is liable for all the consequences of his illegal act. And if it be so—if this slave was not in his employ by the consent of the owner—how do the cases of *McMullan* and *Metcalf* apply ? He cannot in such event be called an agent of Scudder.

But if our property was hired to him, (in which can only the cases he cites be applicable,) then, it was a case of bailment, and he is responsible to us for want of care in employing competent persons.

*By the Court.*—LUMPKIN, Judge.

Wylly Woodbridge brought an action on the case against Amos Scudder, to recover the value of a negro boy, by the name of Ned, a carpenter, killed on board the Ivanhoe, owned by the defendant. It was alleged in the declaration that the property was lost by the carelessness and mismanagement of the captain of the boat, who was employed by the owner. This boy had been hired as a carpenter to make the trip from Savannah to St. Mary's, and becoming entangled in the water-wheel, in aiding to get the boat off, he was drowned. Judge Fleming, before whom the cause was tried in Chatham county, charged the jury, that if they found that the death of the slave was occasioned by the negligence or want of skill in the officers of the Ivanhoe, in the employment of Amos Scudder, that *he* was liable for the loss accruing from such negligence or want of skill. The jury returned a verdict for five hundred dollars. The defendant below excepted to the charge of the court, and now assigns for error that the instruction to the jury was wrong, and that the plaintiff in error is not liable for any carelessness of his agents to those in his employ.

The verdict of the jury having established the fact that the death of the slave was produced by the negligence or want of skill of the officers on board the boat, I shall not pretend to scrutinize the testimony, but address myself at once to the inquiry, whether, conceding the fact as found by the verdict, Scudder is liable to Woodbridge ? This question is new in our State, and well deserves the gravest consideration.

The general doctrine, as contended for by counsel for plaintiff in error, may be correct. It is distinctly laid down in *Story on Agency*, and other elementary writers, and fully sustained by the adjudications adduced from South Carolina, Massachusetts, New York and England.—1 *McMullan Rep.* 385 ; 4 *Met.* 49 ; 6 *Hill Rep.* 592 ; *Priestly* vs. *Fowler*, 3 *Mees. and Welsb.* And we are disposed to recognize and adopt it, with the cautions, limitations and restrictions in those cases. But interest to the owner, and humanity to the slave, forbid its application to any other than *free white agents.* Indeed, it cannot be extended to slaves, *ex necessitate rei.*

Scudder *vs.* Woodbridge.

The argument upon which the decisions referred to mainly rest is, that public policy requires that each person engaged on steamboats and railroads should see that every other person employed in the same service does his duty with the utmost care and vigilance ; that every hand is qualified for his place, and that everything connected with the line is in good order.   Moreover, it is urged, that the want of recourse on the principal will not only make each agent more careful himself, but induce him to stimulate others to like diligence.   Can any of these considerations apply to slaves ?   *They* dare not interfere with the business of others.   They would be instantly chastised for their impertinence.   It is true that the owner, or *employer*, of a slave is restrained by the Penal Code from inflicting on him cruel, unnecessary and excessive punishment ; and that *all others* are forbidden to beat, whip or wound them, *without sufficient cause or provocation.*   But can any one doubt that if this unfortunate boy, although shipped as a carpenter, had been ordered by the captain to perform the perilous service in which he lost his life, and he had refused or remonstrated, that he would have received prompt correction ? and that *on the trial* on a bill of indictment for a misdemeanor, his conduct would have been deemed a sufficient justification for the supposed offence ?   No ! slaves dare not intermeddle with those around, embarked in the same enterprise with themselves.   Neither can they testify against their misconduct.   Neither can they exercise the salutary discretion, left to free white agents, of quitting the employment when matters are mismanaged, or portend evil.   Whether engaged as carpenters, bricklayers or blacksmiths—as ferrymen, wagoners, patroons or private hands, in boats or vessels in the coasting or river navigation, on railroads, or any other avocation—they have nothing to do but silently serve out their appointed time, and take their lot in the mean while in submitting to whatever risks and dangers are incident to the employment.   Bound to fidelity themselves, they do not, and cannot act as securities, either for the care or competency of others.   And what can the master know of the condition of the vessel, road, work or machinery, where his servant is employed, or of the skill or prudence of the persons associated with him ?   No two conditions can be more different than these two classes of agents : namely, slaves and free white citizens ; and it would be strange and extraordinary indeed if the same principle should apply to both.

Again : a large portion of the employees at the South are either slaves or free persons of color, wholly irresponsible, *civiliter*, for their neglect or malfeasance.   The engineer on the Ivanhoe was a colored man.   Had the accident been attributable to his mismanagement, to whom should Woodbridge have looked for redress ?   But we think it needless to multiply reasons upon a point so palpable.   There is one view alone which would be conclusive with the court.   The *restriction of this rule is indispensable to the welfare of the slave.*   In almost every occupation, requiring combined effort, the employer necessarily intrusts it to a variety of agents.   Many of those are destitute of principle, and bankrupt in fortune.   Once let it be promulgated that the owner of negroes hired to the numerous navigation, railroad, mining and manufacturing companies which dot the whole country, and are rapidly increasing—I repeat, that for any injury done to this species of property, let it be understood and settled that the *employer* is not liable, but that the owner must look for compensation to the co-

*servant* who occasioned the mischief, and I hesitate not to affirm, that the life of no *hired* slave would be safe. As it is, the guards thrown around this class of our population are sufficiently few and feeble. We are altogether disinclined to lessen their number or weaken their force. We are, therefore, cordially, confidently and unanimously agreed, and so adjudge, that the judgment below be affirmed, with costs.